**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

———————————————————— :
ALFRED W. SCHWEIKERT, III,    :
                              :       Civil Action No. 12-5876 (FLW/DEA)
            Plaintiff,    :
                              :
      v.                    :
                              :           **OPINION**
BAXTER HEALTHCARE CORP., <u>et al.</u>,    :
                              :
          Defendants.  :
———————————————————:

<u>**WOLFSON, United States District Judge**</u>:

Presently before the Court are cross-motions for summary judgment filed by Defendants Baxter Healthcare Corp., et. al, ("Defendants," or "Baxter") and Plaintiff Alfred W. Schweikert, III ("Plaintiff," or "Schweikert"). Both Plaintiff and Defendants seek summary judgment on claims and counter-claims stemming from Plaintiff's decision to accept full-time employment with Ikaria, Inc. while he was simultaneously employed full-time at Baxter, and Baxter's decision to terminate Plaintiff's employment without awarding Plaintiff severance or a stay bonus.

For the reasons that follow, Defendants' motion for summary judgment on Plaintiff's Amended Complaint is granted, and their motion for summary judgment on Defendants' counter claims is denied. Plaintiff's cross-motion for summary judgment on his Amended Complaint is denied, and his cross-motion for summary judgment on Defendants' counter-claims is granted.

### I.    <u>Background</u>

<u>**Schweikert's Employment with Baxter**</u>

The following facts are undisputed unless otherwise indicated. Schweikert became employed with Baxter on or about September 10, 2007, as Director of Global Regulatory Affairs, Medication

Delivery. Plaintiff's Statement of Material Facts ("Pl.'s Stmt. of Facts") ¶ 1; Parikh Certif. Ex. A. The August 21, 2007 letter offer of employment between Baxter and Schweikert required Schweikert to sign Baxter's Employment Agreement (the "Employment Agreement"). Defendants' Statement of Material Facts ("Defs.' Stmt. of Facts") ¶ 4. Schweikert signed the Employment Agreement on August 27, 2007. Defs.' Stmt. of Facts ¶ 5; Schweikert Dep. 121:6–8; *see also* Aug. 27, 2007 Employment Agreement.

The Employment Agreement included a section titled "Duty of Loyalty," which provided, in relevant part, that Schweikert "will exert [his] best efforts in the performance of [his] duties as an employee of Baxter and will remain loyal to Baxter during the term of [his] employment." Defs.' Stmt. of Facts ¶ 6; Aug. 27, 2007 Employment Agreement, pp. 1-2. The same section further stated that Schweikert was "not presently engaged in, nor shall [he], during the term of [his] employment with Baxter, enter into any employment or agency relationship with any third party whose interests might conflict with those of Baxter." *Id.* Schweikert commenced employment with Baxter on September 10, 2007, as the Director of Global Regulatory Affairs, at its New Providence, New Jersey location, and remained in that position throughout his Baxter employment. Defs.' Stmt. of Facts ¶ 7. Schweikert initially reported to Lisa Skeens, Vice President of Regulatory Affairs, and later reported to Amy Giertych, Senior Director of Regulatory Affairs, who worked at Baxter's locations in Deerfield, Illinois and Round Lake, Illinois. Defs.' Stmt. of Facts ¶ 16; Schweikert Dep. 118:11–18; 176:20–24.

During Schweikert's employment with Baxter, the Company issued a Code of Conduct (the "Code of Conduct"). Defs.' Stmt. of Facts ¶ 8; *see also* Baxter Code of Conduct. On at least two occasions, February 2, 2009 and March 22, 2010, Schweikert signed an Employee Acknowledgement of the Baxter Code of Conduct, which stated that he had received Baxter's

Code of Conduct and "underst[oo]d that standards that apply to [his] work and agree[d] to comply with their terms." Defs.' Stmt. of Facts ¶ 10; Schweikert Dep. 122:1–125:3; Feb. 2, 2009 Signed Acknowledgement of the Code of Conduct. The Code of Conduct contained a section entitled "Conflicts of Interest." Defs.' Stmt. of Facts ¶ 11; *see also* Baxter Code of Conduct, p. 12. In relevant part, the Conflicts of Interest section stated that "[a] conflict of interest may arise when an employee's private interest interferes or even appears to interfere with Baxter's interests." *Id.* The Code of Conduct's Conflicts of Interest section also provided that "Time Conflicts of Interest may happen when you are engaged in a second job or business of your own that may conflict with your responsibilities to Baxter." Defs.' Stmt. of Facts ¶ 12. The Code of Conduct's Conflicts of Interest section further provided that "[i]n all of these situations, Baxter employees must disclose any apparent or actual conflicts to management." Defs.' Stmt. of Facts ¶ 13. "When Baxter management approves an apparent or actual conflict, the approval decision must be documented." *Id.*

**Baxter's Transition of Operations to Illinois**

In September 2011, Baxter undertook an initiative to transition the business operations in New Providence, New Jersey to Northern Illinois. Defs.' Stmt. of Facts ¶ 17; Pl.'s Stmt. of Facts ¶ 2; Schweikert Dep. 126:9–14; *see also* Sept. 2, 2011 Stay Bonus Memorandum. In connection with the transition of these business operations, in a memo from Bob Davis, General Manager, dated September 21, 2011, Baxter offered Schweikert a "retention payment(s)" ("the Stay Bonus"), in addition to his regular salary, as an incentive to remain with Baxter through its "transition period" and ensure the successful transition of Baxter's business to Illinois. Pl.'s Stmt. of Facts ¶ 3; Defs.' Stmt. of Facts ¶ 18. Schweikert signed the Stay Bonus Agreement on October 7, 2011, and thereby "agree[d] with the terms, conditions, and provisions of the special bonus program as detailed"

therein. Defs.' Stmt. of Facts ¶ 10; Schweikert Dep. 132:12-17; *see also* Sept. 2, 2011 Stay Bonus Memorandum. In relevant part, the Stay Bonus Agreement provided that (a) Schweikert would be eligible to receive a Stay Bonus in the amount of $32,000; (b) "[p]ayment of the incentive will be made no later than 60 days after July 2, 2012"; (c) "[p]ayment of the bonus will be contingent upon [Schweikert's] remaining an employee and continuing in this assignment . . . throughout the bonus period"; (d) "[t]reatment of payment in cases of involuntary termination will be handled on a case-by-case basis, at the sole discretion of Baxter's senior management"; (e) if Schweikert were to be "terminated involuntarily, Baxter senior management reserves the right to rescind this bonus in its entirety"; and (f) "[n]othing herein alters [Schweikert's] at-will employment status [US] or any other legal right Baxter may have under applicable law to terminate [Schweikert's] employment prior to July 2, 2012." Defs.' Stmt. of Facts ¶ 21; Pl.'s Stmt. of Facts ¶ 6; *see also* Sept. 2, 2011 Stay Bonus Memorandum.[1]

Defendant states that from the Fall of 2011 through May 2012, Schweikert continued to be responsible for supervising the team of regulatory professionals at Baxter's New Providence location.[2] Defs.' Stmt. of Facts ¶ 24; Schweikert Dep. 143:21–144:1. Defendant argues that

---

[1] Defendant states that "[i]n a January 31, 2012 e-mail, Schweikert confirmed that his 'stay bonus of $32,000 [was] contingent on [his] continuing [with Baxter] until July 2, 2012.'" Defs.' Stmt. of Facts ¶ 22. Defendant bases this statement on the fact that Plaintiff failed to respond to Defendant's request for admission within the specified time period, and, thus, pursuant to Rule 36(a)(3), the requests are deemed admitted. Plaintiff responds that the statement "is not admitted as a contract interpretation." Pl.'s Response to Defs.' Stmt. of Facts ¶ 22.

[2] Plaintiff disputes this statement, pointing to his own statements of fact that (1) "Plaintiff attended a final meeting with Andrea Saccento [HR representative] on May 11, 2012, which . . . Schweikert recalled as being the designated 'clean out your desk day.' During the interview, it was confirmed that there was no remaining work to be performed or responsibilities to be completed regarding Baxter employment, and [P]laintiff was presented with the Severance Agreement," and (2) "Saccento testified that she recalled wishing . . . Schweikert 'well.'" Pl.'s Stmt. of Facts ¶¶ 33, 34 (citing Saccento Dep. 85; Schweikert Dep. 150–153).

"during the transition period, Baxter expected Schweikert to continue to perform his job duties and responsibilities and to report on a daily basis to the New Providence location."[3] Defs.' Stmt. of Facts ¶ 25; Boltz Certif. ¶ 9; Saccento Dep. 68:23–69:11, 70:18–22. As part of the transition, Schweikert's responsibilities were being transferred to Andrea Doyle (who had been one of his direct reports), who was moving from the New Providence to the Deerfield, Illinois location. Defs.' Stmt. of Facts ¶ 26; Schweikert Dep. 102:17–103:5; 146:23–147:2; 176:25–177:3. During the transition period, Baxter continued to pay Schweikert his full salary and provide him with all employment benefits associated with his employment. Defs.' Stmt. of Facts ¶ 27; Boltz Certif. ¶ 10. Plaintiff states, and Defendants do not dispute, that "[d]uring the transition period, there were

_____

[3] Plaintiff disputes this statement, stating that "there is evidence that such a conclusion was not a requirement during the period indicated." Pl.'s Response to Defs.' Stmt. of Facts ¶ 25. Specifically, Plaintiff states that Schweikert was specifically advised by his supervisor, Amy Giertych, that his responsibilities prior to his separation from Baxter would consist of (1) evaluating and preparing a "30-60-90" day list of items to be completed prior to the transition period, (2) assist and train another Baxter employee who would "essentially be absorbing" Schweikert's job responsibilities in Illinois, and (3) supervising just one of the four employees he had previously supervised. Pl.'s Stmt. of Facts ¶¶ 13–16 (citing Schweikert Dep: 146–47; Jan. 12, 2013 Schweikert Certif.). Further, Plaintiff states that Geirtych and Bob Davis "specifically told Plaintiff that his transition period responsibilities with Baxter would end and otherwise be deemed finalized after [the] aforementioned tasks were complete and further assured . . . Schweikert [that] there would be no reason to remain with Baxter after this time, and (2) Giertych further stated Schweikert's work in connection with the transition initiative "would be completed well before the July 2, 2012 separation date set forth in the Severance Agreement . . . . Giertych went so far as to advise . . . Schweikert that his remaining responsibilities at Baxter would be completed by May 1, 2012 or before." Pl.'s Stmt. of Facts ¶¶ 17, 18 (citing Oct. 30, 2013 Schweikert Certif.). Finally, Plaintiff states that Bob Davis stated that the closing would be a lot sooner and he would be taken care of as long as he worked with them during the shutdown." Pl.'s Smt. of Facts ¶ 19 (citing Schweikert Dep. 126:9–128:7).

While Defendants do not dispute that Schweikert's direct reports dwindled from four to one, Defendants argue that (1) Geirtych and Davis's statements as characterized by Schweikert are inadmissible hearsay, (2) Schweikert has testified that he was responsible for supervising employees "all the way up to my final day," and (3) Plaintiff "admits that the terms of his Stay Bonus and Severance Agreement required him to remain an employee of Baxter through July 2, 2012." Defs.' Response to Pl.'s Stmt. of Facts ¶¶ 13, 14, 16, 18, 19 (citing Garland Certif. Ex. A. at 128:4–9, 143:21–144:7).

no issues articulated to [Schweikert] regarding Plaintiff's job performance and no documents exist to substantiate otherwise." Pl.'s Stmt. of Facts ¶ 27; Defs.' Response to Pl.'s Stmt. of Facts ¶ 27.

On May 11, 2012, Schweikert received a Severance Agreement (the "Severance Agreement") from Baxter. Defs.' Stmt. of Facts ¶ 28; Schweikert Dep. 154:1-3; Saccento Dep. 79:11-22; *see also* Severance Agreement. The Severance Agreement stated that Schweikert's "employment with the Company ends on July 2, 2012 ('Separation Date')." Defs.' Stmt. of Facts ¶ 29; Saccento Dep. 79:11-22; *see also* Severance Agreement. The Severance Agreement also provided that Schweikert "will be paid up through and including the Separation Date for all work performed on regularly scheduled pay dates at [his] current base salary less all appropriate withholdings." Defs.' Stmt. of Facts ¶ 30; *see also* Severance Agreement. The Severance Agreement further provided that, subject to its terms, Schweikert would be paid "total severance pay equal to the gross lump sum amount of $50,382.96 less all appropriate withholdings." Defs.' Stmt. of Facts ¶ 31; *see also* Severance Agreement. The Severance Agreement also instructed that "EMPLOYEE MAY NOT SIGN THIS AGREEMENT PRIOR TO EMPLOYEE'S SEPARATION DATE." Defs.' Stmt. of Facts ¶ 32; *see also* Severance Agreement (emphasis in original).

### Schweikert's Employment with Ikaria and Termination of Employment with Baxter

On May 22, 2012, Saccento received an interoffice envelope containing an announcement that Schweikert had been placed with Ikaria, a company unrelated to Baxter. Defs.' Stmt. of Facts ¶ 33; Pl.'s Response to Defs.' Statement of Material Facts ("Pl.'s Response to Defs.' Stmt. of Facts") ¶ 33; Saccento Dep. 88:1-6, 88:24-90:4; Mar. 27, 2012 Announcement. The announcement, which was published by The Stevenson Group, an executive search firm, was dated March 27, 2012, and stated in part as follows:

> The Stevenson Group has announced the placement of Alfred Schweikert, PhD as Senior Director, Regulatory Affairs, CMC at Ikaria Inc. Dr. Schweikert, a seasoned

scientist and regulatory professional, comes to Ikaria with 25 years of pharmaceutical regulatory affairs management experience. Prior to joining Ikaria, he served as Director of Global Regulatory Affairs at Baxter Healthcare Corporation, where he was responsible for strategic direction of the RA function within a portfolio, region, and business unit . . . .

Defs.' Stmt. of Facts ¶ 34; Saccento Dep. 87:14–23; Mar. 27, 2012 Announcement. Schweikert testified at his deposition that he did not inform anyone in Human Resources that he was working at Ikaria. Defs.' Stmt. of Facts ¶ 37; Schweikert Dep. 156:6–8. Schweikert also testified at his deposition that he did not inform anyone in Human Resources that he was working at Ikaria. Defs.' Stmt. of Facts ¶ 37; Schweikert Dep. 156:6–8. Schweikert admitted at his deposition that he did not ask anyone in Baxter's management whether it was "okay for [him] to work for Ikaria and Baxter at the same time"; rather, he decided on his own "that it was okay." Defs.' Stmt. of Facts ¶ 38; Schweikert Dep. 157:5–12. Schweikert further admitted at his deposition that he understood that if he resigned from Baxter before July 2, 2012, then he would not receive the Stay Bonus. Defs.' Stmt. of Facts ¶ 39; Schweikert Dep. 148:23–149:3.

According to Ikaria's offer letter to Schweikert, which was produced in discovery, Schweikert would commence employment with Ikaria on March 27, 2012 as Senior Director Regulatory Affairs – CMC, with an annual base salary of $235,000. Defs.' Stmt. of Facts ¶¶ 57, 58.; Garland Certif. Ex. X. At his deposition, Schweikert admitted that Ikaria placed him on the payroll at his base salary of $235,000 as of March 27, 2012. Defs.' Stmt. of Facts ¶ 59; Schweikert Dep. 50:21–23, 51:7–9. The parties dispute when Schweikert began full-time employment with Ikaria. Defendant points to Schweikert's deposition testimony that (1) he began reporting to work at Ikaria during "middle to late" April 2012,[4] (2) he was providing "a full day's work to Ikaria"

_____

[4] Plaintiff argues that "it is not admitted that Plaintiff began working at Ikaria during middle to late 2014, because the deposition testimony cited is more limited, and indicates only having an

during April and May 2012, and (3) he was not reporting to work at Baxter on a daily basis in April and May 2012.[5] Defs.' Stmt. of Facts ¶ 60; Schweikert Dep. 42:7–13, 44:10–13; Schweikert Dep. 60:17-61:4; Schweikert Dep. 170:11-19.

On the same day that Saccento received the Stevenson Group announcement, she informed Linda Boltz, Director of Human Resources, and Baxter's Legal Department, of its contents and requested their advice. Defs.' Stmt. of Facts ¶ 40; Saccento Dep. 89:1–15; *see also* Email Correspondence between Boltz and Saccento; Boltz Certif. ¶ 12. In addition, she called Schweikert at Ikaria and went into his voicemail, which, according to Defendant, confirmed that Schweikert was indeed working for Ikaria. Defs.' Stmt. of Facts ¶ 40; Saccento Dep. 91:1–11. Saccento subsequently reached Schweikert by phone; according to Schweikert, Saccento told him, "You are supposed to be working here" – meaning at Baxter. Defs.' Stmt. of Facts ¶ 41; Schweikert Dep. 52:21–53:2. At the end of their conversation, Schweikert said, "You are not going to make problems out of all this," and Saccento replied, "Yes. It looks that way." Defs.' Stmt. of Facts ¶ 41; Schweikert Dep. 53:13–15.[6]

In response to the announcement and Saccento's conversation with Schweichert, Baxter conducted an investigation to determine whether Schweikert was working for Ikaria. Defs.' Stmt.

---

initial day, without indicating any start of some full time work schedule." Pl.'s Response to Defs.' Stmt. of Facts ¶ 60.

[5] Defendant also states that as of March 17, 2012, Schweikert's annual salary with Baxter was $218,325.95 per year. Defs.' Stmt. of Facts ¶ 63; Boltz Certif. ¶17. Plaintiff disputes this statement, arguing that it is an "insufficient reference to admit exact salary where the support is only a certification statement of an H.R. employee of Baxter." Pl.'s Response to Defs.' Stmt. of Facts ¶ 63.

[6] Plaintiff notes in his response to Defendant's statement of facts that the conversation also contained the following comments: (1) Plaintiff also stated that he had cleaned out his office and that Saccento was aware of that fact, and (2) Plaintiff stated to Saccento that Ikaria was not a competitor of Baxter and that Saccento agreed. Pl.'s Response to Defs.' Stmt. of Facts ¶ 41.

of Facts ¶ 43; Boltz Certif. ¶ 13. As part of its investigation, Baxter's security personnel reviewed Schweikert's Baxter e-mail account and uncovered a number of emails that, according to Defendant, showed that he had been working for some time at Ikaria and had been trying to keep Baxter from finding out what he was doing.[7] Defs.' Stmt. of Facts ¶ 43; *see also* Defs.' Stmt. of Facts ¶¶ 44–50; Boltz Certif. ¶¶ 14–15; Schweikert Emails Uncovered by Baxter Security Personnel.

For his part, Schweikert stated at his deposition that no one in Baxter's management or human resources ever informed him that he could perform work for another company while he remained employed by Baxter. Defs.' Stmt. of Facts ¶ 52; Schweikert Dep. 175:18–176:1. Further, Schweikert stated that he did not believe his employment agreement or any other agreements with Baxter precluded him from seeking employment at another place, or having employment at two places. Pl.'s Response to Defs.' Stmt. of Facts ¶ 52; Pl.'s Stmt. of Facts ¶ 30.

---

[7] Defendants cite to the following emails: (1) an e-mail Schweikert sent on March 15, 2012, in which Schweikert informed Mike Gronsky, a friend, that he "got offered a really good job starting April 2nd and it[']s in the old Foster Wheeler bldg."; (2) an e-mail he sent on March 16, 2012, in which Schweikert advised Craig Flanagan, Sr., Manager New Product Development for Ikaria (and who had previously worked for Baxter), that he was "[w]orking on a deal. Don't want anyone from Baxter to know." (3) an e-mail Schweikert received on March 19, 2012, from Michael Baytoff, an acquaintance with whom he went fishing, in which Baytoff asked "you wanna fish next tues/weds/thurs[?]," and to which Schweichert replied, "First day of work at a new job on [T]uesday"; (4) an e-mail Schweikert received on March 21, 2012, from Steve Knapp, Vice President of Regulatory Affairs at Ikaria, Knapp asked Schweikert if "either Andrea [Gosda] or Ivy [Bautista]" – both of whom were employed at the time by Baxter – were aware "that you have accepted the job here?" – meaning at Ikaria, (5) an e-mail Schweikert received on April 23, 2012, from Charles McLeskey, M.D., a Senior Medical Director at Baxter, in which McLeskey wrote that he had "[j]ust received an announcement from Ikaria" that Schweikert was working there and to which Schweikert replied, "please keep confidential until you talk to me." Defs.' Stmt. of Facts ¶¶ 44, 45; Schweikert Dep. 39:7–14, 63:1–6, 64:5–66:3, 71:21–72:3, 74:7–75:17, 81:8-82:10; Garland Certif. Exs. N, O, P, Q, R; Boltz Certif. Ex. C.

Plaintiff responds that "it is not admitted that any emails show Plaintiff working at Ikaria for some time and trying to conceal it from Baxter. Defendants' statement is merely a speculative conclusion from the emails." Pl.'s Response to Defs.' Facts ¶ 43.

In a letter dated May 30, 2012, and received by Schweikert shortly after that date, Saccento wrote:

> I was very disappointed to find that you had accepted and commenced employment with another company on April 2nd 2012, without resigning your employment with Baxter Healthcare Corporation ("Baxter"). Your Baxter employment was terminated effective May 25, 2012.

Defs.' Stmt. of Facts ¶ 53; Schweikert Dep. 88:7–17; May 30, 2012 Letter from Saccento to Schweikert. The May 30 letter also stated, "We expect you to repay any Baxter wages delivered to you since April 2nd, 2012 when you started your employment with another employer." Defs.' Stmt. of Facts ¶ 53. The May 30 "letter also serve[d] as notice that [Schweikert was] no longer eligible for severance or [his] retention bonus." *Id.*

**Schweikert's Attempt to Collect Severance**

By letter dated June 4, 2013, Schweikert requested a determination in connection with Baxter's revocation of severance benefits pursuant to the Baxter Severance Pay Plan (the "Severance Plan"). Defs.' Stmt. of Facts ¶ 67; Pl.'s Response to Defs.' Stmt. of Facts ¶ 67; Donohue Certif. ¶ 3; June 4, 2013 Letter from Gebhardt and Kiefer. The Severance Plan states that eligibility for severance pay may arise when Baxter eliminates an employee's position or reduces the size of its workforce, provided that an individual's employment did not end for any other reason.[8] Defs.' Stmt. of Facts ¶ 64. Termination "for cause, as determined at the sole discretion of Baxter," is among the nonexhaustive list of examples given in the Severance Plan to illustrate

---

[8] In response to Defendant's characterization of the Plan, Plaintiff states that "[i]t is not admitted that the law permits disqualification of an otherwise qualified employee by a termination without cause, making the plan illusory and a violation of good faith and fair dealing." Pl.'s Response to Defs.' Stmt. of Facts ¶ 64.

According to the terms of the Severance Plan, Baxter funds the Severance Plan out of its current operating funds. Defs.' Stmt. of Facts ¶ 66; Severance Plan, at p. 3.

reasons for the termination of employment that render an individual ineligible for severance pay.[9] *Id.*; Severance Plan, at p. 2. According to the Severance Plan, the Severance Plan Administrator "has sole discretionary authority to interpret and construe the provisions of the Severance Plan, to determine eligibility for benefits under the Severance Plan, and to resolve any disputes that arise under the Severance Plan." Defs.' Stmt. of Facts ¶ 65; Severance Plan, at p. 12.

By letter dated December 5, 2013, The Plan Administrator – the Administrative Committee of Baxter International, Inc. ("the Committee") denied Schweikert's request for severance benefits under the Baxter Severance Pay Plan because the Committee determined that Plaintiff "was terminated for cause, as determined by Baxter, and therefore, is not entitled to receive benefits from the Plan." Defs.' Stmt. of Facts ¶ 69; Dec. 5, 2015 Letter from Administrative Committee to Baxter. Schweikert appealed the Committee's determination by letter dated February 7, 2014.[10] Defs.' Stmt. of Facts ¶ 70; Feb. 7, 2014 Letter from Schweikert to Administrative Committee. By letter dated June 27, 2014, the Committee denied Schweikert's appeal because he had been "terminated for cause" as "an employee cannot hold full-time employment with Baxter and another

---

[9] Specifically, the Severance Plan states that "[i]f it is discovered that you engaged in conduct during your employment that would have provided a basis for dismissal for 'cause,' as determined by Baxter, any severance payments that you might have been entitled to will cease without prior notice, and you will forfeit any right to further payments under the plan." Pl.'s Stmt. of Facts ¶ 12; Severance Plan.

[10] Thereafter, in April 2014, Schweikert requested to provide oral testimony in support of his appeal; his request was denied and he was instead instructed by the Committee to submit his testimony in writing. Defs.' Stmt. of Facts ¶ 71; Donohue Certif. ¶ 7. On May 23, 2014, Schweikert submitted a Certification to the Committee, dated May 21, 2014, in support of his appeal. Defs.' Stmt. of Facts ¶ 72; May 23, 2014 Letter from Schweikert to Administrative Committee.

employer simultaneously."[11] Defs.' Stmt. of Facts ¶ 73; June 24, 2014 Letter from Administrative Committee to Baxter.

On or about July 23, 2012, Plaintiff filed this lawsuit against Baxter in the Superior Court of New Jersey Law Division, Hunterdon County. In his Complaint, Plaintiff asserted the following causes of action: (1) in Count One, breach of the Stay Bonus Agreement and the Severance Agreement; (2) in Count Two, breach of the duty of good faith and fair dealing; (3) in Count Three, fraud and misrepresentation; (4) in Count Four, unjust enrichment, quasi-contract, and quantum merit; (5) in Count Five, estoppel; (6) in Count Six, "interference with an advantageous contractual relationship," and (7) in Count Seven, individual misrepresentation and fraud. On September 18, 2012, Defendants removed the case to this Court on the basis of diversity jurisdiction and, thereafter, moved to dismiss Counts One, Three, and Four of the Complaint. On May 10, 2013, this Court granted Defendants' motion in part and denied it in part, dismissing (1) Count One as to the Severance Agreement only and (2) Count Three. On July 31, 2014, Plaintiff filed an Amended Complaint, asserting (1) in Count One, breach of the Stay Bonus Agreement; (2) in Count Two, breach of the duty of good faith and fair dealing; (3) in Count Three, unjust enrichment, quasi-contract, and quantum merit; (4) in Count Four, estoppel; (5) in Count Five, "claim for benefits under the Plan," and (6) in Count Six, "interference with an advantageous contractual relationship." In their Answer, Defendants asserted the following counter-claims: (1) in Count One, breach of contract; (2) in Count Two, breach of the duty of good faith and fair dealing; and (2) in Count Three, breach of the duty of good faith, loyalty, and trust; and (4) in

---

[11] The Committee rejected Schweikert's argument that employment with Ikaria did not violate any duties to Baxter because Ikaria allegedly did not compete with Baxter in the marketplace; it found that the terms of Schweikert's employment did not permit "simultaneous full-time employment with a third party." Defs.' Stmt. of Facts ¶ 74; June 24, 2014 Letter from Administrative Committee to Baxter.

Count Four, "faithless servant"; and (5) in Count Five, conversion. Thereafter, Defendants moved, and Plaintiff cross-moved, for summary judgment on all claims.

## II.    Standard of Review

A moving party is entitled to judgment as a matter of law where there is no genuine issue as to any material fact. *See* Fed R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)); *Brooks v. Kyler,* 204 F.3d 102, 105 n. 5 (3d Cir. 2000) (citing FED R. CIV. P. 56(c)). The burden of demonstrating the absence of a genuine issue of material fact falls on the moving party. *See Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 305 (3d Cir. 1999). Once the moving party has satisfied this initial burden, the opposing party must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.*, 19 F.3d 1358, 1366 (3d Cir. 1996).

Not every issue of fact will be sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Further, the nonmoving party cannot rest upon mere allegations; he must present actual evidence that creates a genuine issue of material fact. *See* FED R. CIV. P. 56(e); *Anderson,* 477 U.S. at 249. In conducting a review of the facts, the non-moving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party. *See Pollock v. Am. Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir. 1986). Accordingly, it is not the court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. *See Brooks,* 204 F.3d at 105 n.5 (citing *Anderson,* 477 U.S. at 249).

## III.    Analysis

### a.  *Plaintiff's Claims*

*i. Count One - Breach of the Stay Bonus Agreement*

Defendants argue that summary judgment is warranted on Count One of Plaintiff's Amended Complaint because, according to the terms of the Stay Bonus Agreement, "achievement of a condition precedent was required before Plaintiff's bonus became payable." Pl.'s Br. at 6. Specifically, Defendants point to language in the Stay Bonus Agreement stating that "[p]ayment of a bonus will be contingent upon [Schweikert's] remaining an employee and continuing in this assignment . . . through the bonus period." *See* Stay Bonus Agreement. Because Defendants terminated Plaintiff's employment on May 25, 2012, before the end of the bonus period on July 2, 2012, Defendants argue that Plaintiff did not fulfill the condition precedent to receiving the bonus. Further, Defendants argue that "the Stay Bonus Agreement expressly granted Baxter the right to deny payment of the Stay Bonus upon an employee's involuntary termination." Defs.' Br. at 6.

Plaintiff, however, argues that (1) "there is no express language in the contract that required . . . Schweikert to continue working through July 2, 201[2] in order to receive compensation" (2) Plaintiff's responsibilities had ended and he was told that his services were no longer required by as early as March or April of 2012, and (3) "he was ready, able, and willing to work through the purported end date." Pl.'s Opp. Br. at 12. Essentially, Plaintiff appears to argue that he had successfully worked through the functional transition period, or, alternatively, that he was capable of working through to July 2, 2012; thus, pursuant to the Stay Bonus Agreement, he is entitled to the Stay Bonus, regardless of his May 25, 2012 involuntary termination.

The Stay Bonus agreement states, in relevant part:

> As an incentive to remain with Baxter through the transition period, we are offering you a retention payment(s) ("Stay Bonus"), which will be tied to the successful transition of the benefits . . . . Specifically, you will be eligible for payment . . . that is equal to the total amount of $32,000. In return for this incentive participation, we ask that you perform in a satisfactory manner all the expected transition requirements that

14

will be discussed. Some additional terms of this special incentive plan are outlined for you below:

2. . . . . Payment of the incentive will be made no later than 60 days after July 2, 2012.

. . .

4. Payment of the bonus will be contingent upon [Schweikert] remaining an employee and continuing in this assignment with a 'meets' performance rating for 2011, throughout the bonus period.

(a) If you voluntarily terminate your employment with Baxter[,] you will not be eligible for the bonus.

5. Treatment of payment in cases of involuntary termination will be handled on a case-by-case basis, at the sole discretion of Baxter's senior management. If you are terminated involuntarily, Baxter senior management reserves the right to rescind this bonus in its entirety.

6. Nothing herein alters your at-will employment status . . . or any other legal right Baxter may have under applicable law to terminate your employment prior to July 2, 2012.

Stay Bonus Agreement at 1–2.

In order to state a claim for breach of contract under New Jersey law, a plaintiff "must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot, Inc.*, 507 F.3d 188, 204 (3d Cir. 2007). Here, the first and third elements of the claim are not at issue. However, whether, as a matter of law, a breach occurred and Plaintiff has performed his own contractual obligations, must be decided by the Court and depends on my interpretation of the Stay Bonus Agreement.

In an action involving contract interpretation, "summary judgment is appropriate only where the contractual language is unambiguous—i.e., 'subject to only one reasonable interpretation.'" *Mylan, Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 419 (3d Cir. 2013) (quoting *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 521 (3d Cir. 1999)). Where the nonmoving party presents a reasonable alternative reading of a contract, "'then a

question of fact as to the meaning of the contract exists which can only be resolved at trial.'" *Id.* (quoting *Newport Assocs. Dev. Co. v. Travelers Indem. Co.*, 162 F.3d 789, 792 (3d Cir. 1998)).

Under New Jersey law, "a contract is ambiguous 'where the contract is susceptible of more than one meaning.'" *Sumitomo Mach. Corp. of Am., Inc. v. Allied Signal Inc.*, 81 F.3d 328, 332 (3d. Cir. 1996) (quoting *Briggs v. United Shoe Machinery Corp.*, 92 N.J. Eq. 277, 287 (Err. & App.), *cert. denied*, 254 U.S. 653 (1920)). In interpreting the contract,

> "[e]vidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded." *Id.* (quoting *Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 301 (1953).

Under New Jersey contract law, "[e]ven in the interpretation of an unambiguous contract, [courts] may 'consider all of the relevant evidence that will assist in determining its intent and meaning.'" *Manahawkin Convalescent v. O'Neill*, 217 N.J. 99, 118 (2014) (quoting *Conway v. 287 Corporate Center Assocs.*, 187 N.J. 259 (2006)). "[A] broad use of extrinsic evidence" is permitted to "uncover the true meaning of contractual terms." *Conway*, 187 N.J. at 347; *see also Bowers v. Foto-Wear, Inc.*, No. 3:CV-03-1137, 2007 WL 906417, at *5 (M.D. Pa. Mar. 22, 2007) (applying New Jersey law).

Here, analysis of Plaintiff's breach of contract claim boils down to the issue of whether the Stay Bonus Agreement is unambiguous regarding Plaintiff's entitlement to the Stay Bonus in the wake of his May 25, 2012 termination. Upon review of the Stay Bonus in its entirety, examining the expectations of the parties, and reading the Stay Bonus in conjunction with the Severance Agreement Plaintiff signed on May 11, 2012, the Court finds that a fair reading of the Stay Bonus

Agreement reveals the unambiguous fact that Plaintiff was required to remain an employee until July 2, 2012, in order to receive a Stay Bonus.

First, the sixth provision of the Stay Bonus Agreement clearly states that Baxter reserved its right to terminate an individual's employment at any point and that payment of the Stay Bonus would only be made 60 days after July 2, 2012. July 2, 2012 is the only date mentioned throughout the Stay Bonus Agreement and it appears clear from those two provisions that July 2, 2012 was the transition's end date as contemplated by Baxter. Further, Plaintiff himself admitted in his deposition that if he had resigned his employment prior to July 2, 2012, he would not be eligible for the Stay Bonus. Schweikert Dep. 148:23–149:3 ("Q: Did you believe that if you resigned from your employment with Baxter before July 2, 2012, you would not receive your stay bonus? A: That's what the agreement says. Q: And that's what you understood? A: Yes.").[12] Finally, the Stay Bonus Agreement may be read in conjunction with the Severance Agreement Plaintiff signed on May 11, 2012, in which it is specified that July 2, 2012 was the date that Plaintiff's employment with Defendants was to end. *See* Severance Agreement at 1 ("Employee's employment with the Company ends on July 2, 2012 ('Separation Date')."). Therefore, it is unambiguous from the Stay

---

[12] Plaintiff points to (1) statements he recounts made by Giertych and Davis indicating that Baxter would be winding up its New Providence operations sooner than July, and (2) a statement made by Saccento indicating that on May 11, 2012, the date Plaintiff signed the Severance Agreement, she wished Plaintiff "well" to argue that Baxter's transition had accelerated and that he had performed his duties up until the end of the bonus period. Pl.'s Stmt. of Facts ¶¶ 13–17, 19, 33, 34 (citing Schweikert Dep: 126:9–128:7, 146–47, 150–153; Oct. 30, 2013 Schweikert Certif.; Jan. 12, 2013 Schweikert Certif.; Saccento Dep. 85). However, Defendants are correct that the Giertych and Davis statements are inadmissible hearsay because they are out-of-court statements repeated by Schweikert and offered for the truth of the matter asserted, and no hearsay exclusion or exception applies. *See* FED. R. EVID. 801, 803. Further, regarding Saccento's deposition, while she stated that she wished Plaintiff well in his interview with Saccento on May 11, 2012, Saccento clearly stated earlier in her deposition that her interview with Plaintiff on that day was not an exit interview; rather, it was an interview to go over the Severance Agreement package and materials. Saccento Dep. 84–85.

Bonus Agreement that the Stay Bonus period was until July 2, 2012, and, thus, Plaintiff's involuntary termination prior to that date did not entitle Plaintiff to the Stay Bonus.[13]

Further, to the extent that Plaintiff argues that he is entitled to the Stay Bonus pursuant to the terms of the Stay Bonus Agreement because he was "ready, willing, and able to work through the purported end date," such an argument flies in the face of the fifth provision of the Stay Bonus, which states that "[t]reatment of payment in cases of involuntary termination will be handled on a case-by-case basis, at the sole discretion of Baxter's senior management. Baxter senior management reserves the right to rescind [the] bonus in its entirety" in the event that Baxter involuntarily terminates an employee. Stay Bonus Agreement at 2.

Plaintiff's remaining arguments to the contrary are unpersuasive. First, Plaintiff argues that New Jersey law strongly disfavors reading a condition precedent into a contract, and, thus, this Court should not do so here. "A condition precedent has been defined as a fact or event occurring subsequently to the making of a valid contract and which must exist or occur before there is a right to immediate performance, before there is a breach of contract duty or before the usual judicial remedies are available." *Malhan v. Anthony Robbins Co.*, No. 05-CV-05951 (WJM), 2006 WL 776778, at *3 (D.N.J. Mar. 24, 2006) (quoting *Watson v. City of Salem*, 934 F. Supp. 643, 660 (D.N.J. 1995)); *see also Moorestown Mgmt. v. Moorestown Bookstore, et al.*, 104 N.J. Super. 250 (Ch. Div. 1969). As Plaintiff notes, "[c]onditions precedent are 'disfavored by the courts' and are to be enforced only where the 'plain language' of a contract 'compels the court to do so.'" *Nye v.*

---

[13] Plaintiff argues that he was really only expected to work for Baxter until June 2, 2012; after that, a thirty-day "non-working notice period" was take effect. However, Saccento stated that after June 2, 2012, a thirty day nonworking notice period would begin, during which Baxter employees were not to accept other employment in advance of the end of the bonus period. Saccento Dep. 62:8–12. Regardless, Plaintiff was terminated effective May 25, 2012, before the June 2nd date he mentions.

*Ingersoll Rand Co.*, 783 F. Supp. 2d 751, 766 (D.N.J. 2011) (quoting *Marsa v. Metrobank for Sav.,
F.S.B.*, 825 F. Supp. 658, 664 (D.N.J. 1993)); *see also Castle v. Cohen*, 840 F.2d 173, 177 (3d Cir.
1988).

Here, the plain language of the Stay Bonus Agreement clearly imposes a condition
precedent by way of its provision that "[p]ayment of the bonus *will be contingent* upon your
remaining an employee and continuing in this assignment with a 'meets' performance rating for
2011, throughout the bonus period." Stay Bonus Agreement at 1 (emphasis added). A
"contingency to a contract is synonymous with a condition." *Ilowite v. Diopsys, Inc.*, 2008 U.S.
Dist. LEXIS 7359, *17, 2008 WL 305267 (D.N.J. Jan. 31, 2008) ("A contingency to a contract is
synonymous with a condition precedent . . . ."). Therefore, the Court is compelled to read the Stay
Bonus Agreement as imposing an obligation on Plaintiff to remain Defendants' employee through
the bonus period in order to receive the Stay Bonus, which he did not do. Thus, Plaintiff's failure
to fulfill a condition precedent absolves Defendants from performing, *i.e.*, paying Plaintiff the Stay
Bonus. *See id.* ("[A]n unfulfilled condition precedent to a contract renders a contract agreement
invalid.") (citing *Sutherland v. Chesson*, No. 02-00981, 2006 WL 1000574, at *8 (N.J. App. Div.
April 18, 2006)); *see also First Atl. Leasing Corp. v. Tracey*, 738 F. Supp. 863, 867 (D.N.J. 1990)
("[W]here a promise is subject to a condition, no liability can arise upon that promise if the
condition is not met."); *Duff v. Trenton Beverage Co.*, 4 N.J. 5795, 604 (1950), ("Generally, no
liability can arise on a promise subject to a condition precedent until the condition is met.")

Next, Plaintiff argues that by terminating him, Defendants made it impossible for him to
fulfill his duties, and, thus, Plaintiff is entitled to the Stay Bonus. New Jersey appellate courts have
stated that "[a] condition precedent may be excused where its performance is prevented or hindered
by a breach of the obligor's duty of good faith and fair dealing," *Allstate Redevelopment Corp. v.*

19

*Summit Associates, Inc.*, 206 N.J. Super. 318, 324 (App. Div. 1985), or where the conduct of the party seeking to avail itself of the condition precedent "has rendered compliance therewith impossible," *Ward v. Merrimack Mut. Fire Ins. Co.*, 332 N.J. Super. 515, 522 (App. Div. 2000). However, the Court does not find such circumstances here that would render application of this equitable rule appropriate and excuse Plaintiff's non-performance.

First, there is no evidence in the record suggesting that Defendants acted in bad faith by creating a condition precedent that was impossible, or next to impossible, to perform. *Compare with Allstate*, 206 N.J. Super. at 323 (excusing Allstate's failure to fulfill the condition precedent where Summit "entered into a lease agreement with Allstate, under which Summit's obligation to perform was conditioned upon an event which it knew was impossible or almost impossible to occur. Yet, Summit failed to inform Allstate of this virtual impossibility, and when Allstate learned of it during the course of pursuing its obligation to obtain the necessary permits and approvals, Summit assured Allstate that the claim would be resolved."); *see also* supra (analyzing Plaintiff's breach of good faith and fair dealing claim). Therefore, the Court finds that Plaintiff's failure to fulfill his obligation to remain employed until July 2, 2012 may not be excused on the basis of any bad faith by Defendants.

Second, *Ward v. Merrimack*, 332 N.J. Super. 515, 526 (App. Div. 2000), the case Plaintiff cites for the proposition that impossibility of fulfilling the condition precedent, regardless of whether the other party acted in bad faith, excuses fulfillment of the condition precedent, is distinguishable. In *Ward*, which examined an insured's right to insurance proceeds, the appellate court found that "there [we]re genuine issues of material facts concerning plaintiff's claim that [the defendant's] wrongful breach of the insurance contract rendered impossible his ability to satisfy the condition precedent that he replace the structure before [the defendant was] obligated to pay

the cost of replacement." *Id.* at 522. Here, however, the Stay Bonus Agreement contains express provisions *allowing* Defendants to involuntarily terminate Plaintiff, and, therefore, making the stay bonus discretionary. *See* Stay Bonus Agreement at 2.

Further, even if Defendants' involuntary termination of Plaintiff excused Plaintiff's failure to fulfill his obligation to remain a Baxter employee until July 2, 2012, the sixth provision of the Stay Bonus Agreement clearly states that Baxter reserved its right to terminate an individual's employment at any point and that in the event of an involuntary termination, Baxter would determine whether a terminated employee was entitled to a bonus on a case by case basis and at its sole discretion. *See* Stay Bonus at 2. Therefore, this provision creates an independent and sufficient basis for Defendants' decision not to pay Plaintiff the Stay Bonus.

Finally, Plaintiff's argument that the Stay Bonus Agreement should be read as illusory is also unpersuasive.[14] "A contract should not be read to vest a party or his nominee with the power virtually to make his promise illusory." *Russell v. Princeton Labs., Inc.*, 50 N.J. 30, 38 (1967). "An illusory promise has been defined as, a 'promise which by its terms makes performance entirely optional with the 'promisor' whatever may happen, or whatever course of conduct in other respects he may pursue.'" *Bryant v. City of Atl. City*, 309 N.J. Super. 596, 620 (App. Div. 1998) (quoting Restatement (Second) of Contracts, § 2, comment e (1979)). "Hence, an illusory promise is one in

---

[14] Plaintiff also argues that "Baxter cannot rescind the stay bonus" because "[r]escission . . . is an equitable remedy and is not granted where there has been substantial performance." Pl.'s Opp. Br. at 16. Plaintiff appears to conflate the term "rescind" as used by Defendants in this provision with the equitable law of rescission, neither of which appear to apply in this case. First, Defendants did not rescind the Stay Bonus; they never gave Plaintiff the bonus. *See* BLACK'S LAW DICTIONARY (10th ed. 2014), "rescind . . . 1. To abrogate or cancel (a contract) unilaterally or by agreement. 2. To make void; to repeal or annul." Further, Defendants are not asking the Court to rescind the Stay Bonus Agreement; they are merely arguing that they did not breach the Stay Bonus Agreement. *See, e.g.*, *Bonnco Petrol, Inc. v. Epstein*, 115 N.J. 599, 607 (1989) (discussing rescission on the basis of mutual mistake and equitable fraud).

which the 'promisor has committed himself not at all.'" *Id.* (quoting J.D. Calamari and Joseph M. Perillo, Contracts, § 4–17 at 159 (2d ed. 1977)). However, "[a] contract that provides a party with discretion, or that is conditional in some way, is not illusory, unless it makes performance entirely optional on the part of the promisor." *Omni Credit Alliance, Inc. v. Kennedy Funding, Inc.*, No. CIV.A. 04-4764 (PGS), 2007 WL 4365314, at *5 (D.N.J. Dec. 12, 2007) *aff'd*, 371 Fed. App'x 252 (3d Cir. 2010) (citing *Bryant*, 309 N.J. Super. at 620). Further, "courts usually seek to avoid" reading a contract as illusory. *Nolan v. Control Data Corp.*, 243 N.J. Super. 420, 431 (App. Div. 1990).

Here, I do not read the Stay Bonus Agreement to be illusory because had Plaintiff remained an employee in good standing until July 2, 2012, Baxter did not have the option to refuse payment of the Stay Bonus pursuant to the terms of the Stay Bonus Agreement; thus, Defendants' promise to pay a Stay Bonus was not completely optional. Further, as other courts have found, when a contract is subject to the implied covenant of good faith and fair dealing, as all contracts in new Jersey are, "[t]his obligation, by itself, is enough to avoid the finding of an illusory promise." *Kennedy, Inc. v. Lion's Gate Development*, 2006 WL 2786927 (D.N.J. September 26, 2006) (citing *In re Cendent Corp. Litig.*, 264 F.3d 286, 300 (3d Cir. 2001) ("An implied obligation to use good faith is enough to avoid the finding of an illusory promise.") (applying New Jersey law). Therefore, Defendants' promise to pay the Stay Bonus Agreement, contingent upon Plaintiff remaining an employee through July 2, 2012, was not an illusory promise.

Because the Stay Bonus Agreement's language is unambiguous in creating a condition precedent that Plaintiff remain a Baxter employee until July 2, 2012, and, further, in stating that involuntary termination of Plaintiff would result in a Stay Bonus being awarded to Plaintiff at the sole discretion of Baxter, it follows that, as a matter of law, Defendants did not breach the Stay

Bonus Agreement when it refused to pay Plaintiff the Stay Bonus due to Plaintiff's involuntary termination effective May 25, 2012.[15] Therefore, summary judgment is granted to Defendants on Count One of Plaintiff's Amended Complaint.

### ii. Count Two - Breach of the Duty of Good Faith and Fair Dealing

Next, I examine whether summary judgment should be granted on Count Two of Plaintiff's Amended Complaint, which alleges that Defendants breached the implied covenant of good faith and fair dealing. "[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing," which is a covenant that "'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420 (1997) (quoting *Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 130 (1965)). When a contract vests a party with discretion, that party "must exercise discretion reasonably and with proper motive." *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 247 (2001). Further, "[u]nlike many other states, in New Jersey a party to a contract may breach the implied covenant of good faith and fair dealing in performing its obligations even when it exercises an express and unconditional right to terminate." *Id.* at 244 (internal citation and quotation marks omitted).

As a threshold issue, it is important to "demonstrat[e] bad motive in order to assert successfully a claim of breach of the implied covenant of good faith and fair dealing. *Id.* at 249; *see also Emerson Radio Corp. v. Orion Sales, Inc.*, 80 F. Supp. 2d 307, 311 (D.N.J. 2000) *rev'd in part on*

---

[15] Finally, Plaintiff's lengthy argument that he should not have been terminated because he did not breach the terms of his Employment Agreement and, thus, should have received his stay bonus, is misplaced. The Stay Bonus Agreement clearly states that "[n]othing herein alters your at-will employment status . . . or any other legal right Baxter may have under applicable law to terminate your employment prior to July 2, 2012." Stay Bonus Agreement, at 2. Further, as stated *supra*, the Stay Bonus agreement is governed by the implied covenant of good faith and fair dealing, cabining Baxter's ability to act unfairly.

*other grounds*, 253 F.3d 159 (3d Cir. 2001) ("The Restatement and the cases note a state of mind or malice-like element to breach of good faith and fair dealing, holding that the duty excludes activity that is unfair, not decent or reasonable, nor dishonest."); *Seidenberg v. Summit Bank*, 348 N.J. Super. 243, 261 (App. Div. 2002).

Here, Plaintiff alleges that the involuntary termination of his employment after he allegedly performed his duties under the Stay Bonus Agreement constitutes a breach of the covenant of good faith and fair dealing by Defendants.  Defendants claim that "[o]n this record, [Plaintiff] cannot demonstrate that [Defendants] acted in bad faith or dishonestly." Defs.' Br. at 8. Rather, Defendants argue, Plaintiff's "deceitful conduct rendered him ineligible for the Stay Bonus." *Id.*

Plaintiff, on the other hand, argues that he "carried out the responsibilities under the Agreement and Baxter received the fruit of the contract. The conversation between plaintiff and his supervisor indicate, without question, that plaintiff had no responsibilities left, had transitioned his direct report . . . successfully and had in fact, cleaned out his office two weeks prior to his termination." Pl.'s Opp. Br. at 24. Further, Plaintiff contends that "[i]n the ultimate display of bad faith . . . Andrea Saccento testified that she knew about [Plaintiff] taking on another position in advance of his termination date but did nothing about it." *Id.*

As Defendants note, Plaintiff provides no citations to the record for these assertions in his opposition brief. The evidence produced does not bear up Plaintiff's arguments or otherwise support a showing of bad faith on the part of Defendants, a critical element of a good faith and fair dealing claim. While Plaintiff states in a certification that he had a conversation with his supervisor, Amy Giertych, his statement is inadmissible hearsay. Oct. 29, 2013 Schweikert Certif. 15-17; *see also* FED. R. EVID. 801. Further, in the email "confirmation" of that conversation between Plaintiff and Giertych, Plaintiff merely states that he "just had [his] exit interview and

24

received [his] severance package from HR" and that that day was "clean out of the office day";
this email does not confirm that Plaintiff had no responsibilities left or had successfully
transitioned his direct report.[16] *See* May 11, 2012 Email between Schweikert and Giertych. Finally,
upon review of Saccento's deposition, Plaintiff's characterization of Saccento's testimony does
not bear up. The first time Saccento states that she heard that Plaintiff had taken on another position
was in May of 2012 and in the form of a rumor; she said that she took no immediate action "because
it was hearsay. It was like a whisper . . . and I had no facts."[17] Saccento Dep. 74:4-5. However,
Saccento states that shortly afterwards, she was anonymously handed the March 2012
announcement about Plaintiff's employment with Ikaria, after which she "quickly reached out to
[her] manager" in an email that very day. Saccento Dep. 88:13–15, 89:18–25.

Further, the Court's independent review of the record reveals, for example, that Saccento
testified that it was Baxter's stated, if unwritten policy, which was communicated to employees at
various meetings, that employees could not accept another position until after July 2, 2012, which
included a thirty-day day non-working notice period. Saccento Dep. 62:8–12 ("One of the
questions [employees asked]. . . was, can they accept a job during their non-working notice, which
I told them they cannot. They . . . can sign an agreement that they can work after July 2nd, after

---

[16] Saccento disputes that the interview she had with Plaintiff on that day was an "exit
interview," and she also disputes that the interview did not take place on a "clean out your desk"
day. Saccento Dep. 82:17–84:5. However, the Court does not find this dispute to be material to the
parties' claims; it has been established that Baxter expected the relevant employees were to work
until June 2, 2012, and then commence a thirty day non-working notice period before being
relieved of their employment and collecting their Stay Bonus.

[17] To the extent that Plaintiff seeks to extrapolate from Saccento's testimony that, in March
2012, Plaintiff handed Saccento a business card from Ikaria's human resources department in case
anybody was looking for a job for the proposition that Saccento knew early on that Plaintiff had
accepted a new position, *see* Saccento Dep. 48–49, such a proposition is not supported in the
record. Saccento gives no indication that Plaintiff's action triggered her realization that Plaintiff
had recently accepted employment at Ikaria. *See id.*

their term date with Baxter."). This fact, revealing that Baxter had established a policy about whether Baxter employees could accept another job offer while on the Baxter payroll, further detracts from Plaintiff's unsupported argument that Baxter used Plaintiff's dual employment as a pretext for nonperformance under the Stay Bonus Agreement.

Simply put, Plaintiff has failed to demonstrate any record evidence that would indicate that Defendants acted in bad faith in terminating Plaintiff pursuant to the Stay Bonus Agreement. Absent such a demonstration, Plaintiff cannot support a claim for the breach of the implied covenant of good faith and fair dealing. *See, e.g.*, *Shilling v. Reassure Am. Life Ins. Co.*, No. CIV.A. 13-2359, 2015 WL 790143, at *5 (D.N.J. Feb. 25, 2015) (granting summary judgment on a good faith and fair dealing claim because plaintiff had "not identified any evidence of ill motive or bad faith").

Therefore, summary judgment is granted to Defendant on Count Two of Plaintiff's Amended Complaint.

### iii.   Count Three - Unjust Enrichment, Quasi-Contract, and Quantum Merit

Third, Plaintiff asserts claims for unjust enrichment, quasi-contract, and quantum merit in Count Three of his Amended Complaint and seeks money for "stay bonus services" Defendants received from Plaintiffs. Am. Compl. 65–66. However, none of these claims may lie when there is an express contract governing the conduct in question.[18] *Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 226–27 (3d Cir. 1983) ("Quasi-contract liability will not be imposed,

---

[18] The Court does not follow Plaintiff's logic in his opposition brief argument that "if it is somehow determined that plaintiff does not prevail [in his breach of contract claim], there is an invalid rescinded contract involved, and, thus, a viable quasi contract claim." Pl.'s Br. at 26. It does not follow that because the Court has decided that Defendants did not breach the terms of the Stay Bonus Agreement, the Stay Bonus Agreement becomes an invalid rescinded contract. Rather, the Court has determined that the Stay Bonus Agreement is a valid contract that unambiguously sanctioned Defendants' decision not to award Plaintiff a stay bonus.

however, if an express contract exists concerning the identical subject matter. The parties are bound by their agreement, and there is no ground for implying a promise as long as a valid unrescinded contract governs the rights of the parties.") (applying New Jersey law); *Kas Oriental Rugs, Inc. v. Ellman*, 394 N.J. Super. 278, 286 (App. Div. 2007) ("It has long been recognized that the existence of an express contract excludes the awarding of relief regarding the same subject matter based on quantum meruit."); *Caputo v. Nice-Pak Products, Inc.*, 300 N.J. Super. 498, 507 (App. Div. 1997) ("[U]njust enrichment is an equitable remedy resorted to only when there was no express contract providing for remuneration.").

Here, I find that the Stay Bonus Agreement, an express contract, governs the parties' conduct regarding payment of the Stay Bonus, which the conduct at issue in Plaintiff's implied contract claims in Count Three. Therefore, summary judgment is granted to Defendants on this Count.

### iv.   Count Four – Promissory and Equitable Estoppel

In Count Four, Plaintiff asserts claims for promissory and equitable estoppel on the following basis: "[i]n the inducement to provide the services required by the Stay Bonus Agreement and in the Severance Agreement, there was a clear and definite promise to provide consideration and payment for completed services without some agreement nullifying and negating that promise, and without procuring employment after rendering services nullifying and negating that promise." Am. Compl. ¶ 68.

"Promissory estoppel is [an] . . . equitable doctrine, not itself a cause of action *ex contractu*, supplanting or obviating other proof of consideration. *Ballard v. Schoenberg*, 224 N.J. Super. 661, 666 1988 N.J. Super. LEXIS 155, *5-6 (App. Div. 1988). The elements of promissory estoppel are: 1) a clear and definite promise, 2) made with the expectation that the promisee will rely upon it, 3) reasonable reliance upon the promise, 4) which results in definite and substantial detriment.

27

*East Orange Bd. of Educ. v. New Jersey Schools Const. Corp.*, 405 N.J. Super. 132, 148, 963 A.2d 865 (App. Div. 2009). "The essential justification for the promissory estoppel doctrine is to avoid the substantial hardship or injustice which would result if such a promise were not enforced." *Pop's Cones, Inc. v. Resorts Intern. Hotel, Inc.*, 307 N.J. Super. 461, 469 1998 N.J. Super. LEXIS 27, *13 (App. Div. 1998).

The doctrine of equitable estoppel prevents a party from repudiating prior conduct if such repudiation "would not be responsive to the demands of justice and good conscience." *Davin, L.L.C. v. Daham*, 329 N.J. Super. 54, 67 (App. Div. 2000) (quoting *Carlsen v. Masters, Mates & Pilots Pension Plan Trust*, 80 N.J. 334, 339 (1979)). "To establish a claim of equitable estoppel, the claiming party must show that the alleged conduct was done, or representation was made, intentionally or under such circumstances that it was both natural and probable that it would induce action. Further, the conduct must be relied on, and the relying party must act so as to change his or her position to his or her detriment." *Miller v. Miller*, 97 N.J. 154, 163 (N.J. 1984). "'A prerequisite of equitable estoppel' is that such reliance be in 'good faith.'" *Phillips v. Borough of Keyport*, 107 F.3d 164, 182 (3d Cir. N.J. 1997) (quoting *Lizak v. Faria*, 96 N.J. 482, 499 (1984)). "The doctrine of equitable estoppel is applied 'only in very compelling circumstances,' 'where the interests of justice, morality and common fairness clearly dictate that course.'" *Palatine I v. Planning Bd. of Township of Montville*, 133 N.J. 546 (1993) (citations omitted).

However, Plaintiff's estoppel claims must fail for the same reason Plaintiff's other quasi-contractual or implied contract claims failed: there are express contracts—the Stay Bonus Agreement and the Severance Agreement—that govern the parties' conduct at issue here. Because the existence of an express contract excludes an implied contract, Plaintiff may not premise an estoppel claim on implied-in-law contractual theories. *Freightmaster USA, LLC v. FedEx, Inc.*,

2015 U.S. Dist. LEXIS 41519, *15 (D.N.J. Mar. 31, 2015) ("[U]nder New Jersey law, liability based on quasi-contractual principles cannot be imposed 'if an express contract exists concerning the identical matter.'") (quoting *Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 226-27 (3d Cir. 1983)); *Dluhos v. Strasberg*, No. 00-CV-3163, 2001 WL 1720272, at *9 (D.N.J. Aug. 31, 2001) *aff'd in part, rev'd in part on other grounds*, 321 F.3d 365 (3d Cir. 2003) (citing *Avery v. Sielcken-Schwarz*, 5 N.J. Super. 195, 200 (App. Div. 1949)); *Brock & Co. v. Kings Row Assocs.*, 2004 WL 2624864 (E.D. Pa. Nov. 17, 2004) (applying New Jersey law).

In the alternative,[19] judgment as a matter of law is appropriate for Defendants on the merits of Plaintiff's estoppel claims. First, Plaintiff's promissory estoppel claim fails on the first element of such a claim, the existence of a clear and definite promise, which "is considered the 'sine qua non for applicability of this theory of recovery.'" *Watson v. City of Salem*, 934 F. Supp. 643, 661 (D.N.J. 1995) (quoting *Malaker*, 163 N.J. Super. at 479). Here, Defendants' promise to pay a Stay Bonus to Plaintiff pursuant to the Stay Bonus Agreement was conditional, as in contingent upon Plaintiff remaining an employee until July, 2, 2012 and upon Defendants' discretion in the event that Plaintiff was involuntarily terminated—it was not clear and definite. Further, Defendants' promise to pay severance to Plaintiff pursuant to the Severance Agreement was also conditional; that promise was contingent if Plaintiff was terminated for cause. *See, e.g.*, *Watson v. City of Salemi*, 934 F. Supp. 643, 661 (D.N.J. 1995) (granting summary judgment to the defendants on

---

[19] New Jersey appellate courts have observed that it is a "general, although not immutable, principle that "there is no ground for imposing an additional obligation when there is a valid unrescinded contract that governs [the parties'] rights." *Berlin Med. Assocs., P.A. v. CMI New Jersey Operating Corp.*, No. A-3034-04T5, 2006 WL 2162435, at *11 (N.J. Super. Ct. App. Div. Aug. 3, 2006) (quoting *Shalita v. Twp. of Washington*, 270 N.J. Super. 84, 90-91, 636 A.2d 568 (App. Div. 1994)).While Plaintiff has not prevented the Court with specific reasoning as to why the Court should apply an exception to this general principle, the Court will consider alternative arguments about the merits of Plaintiff's estoppel claims out of an abundance of caution.

the plaintiff's promissory estoppel claim because "the promise made to Plaintiff was clearly conditional and contingent, as opposed to clear and definite—contingent upon a satisfactory completion of the required background check"). Plaintiff also fails to establish a "definite and substantial detriment" that resulted from Plaintiff's reliance on Defendants' promises to pay Plaintiff a Stay Bonus or severance such that would warrant equitable relief. Rather, the record indicates that Plaintiff received his base salary from Baxter through his termination date of May 25, 2012, and, indeed, that he was also placed on Ikaria's payroll at a base salary of $235,000, as of March 27, 2012. Schweikert Dep. 50:21–23, 51:7–9. *See, e.g.*, *Grant v. Coca-Cola Bottling Co. of New York*, 780 F. Supp. 246, 250 (D.N.J. 1991).

Second, Plaintiff's equitable estoppel claim fails because Plaintiff does not demonstrate that he changed his position to his detriment in good faith reliance on Defendants' representations or conduct. While Plaintiff argues that he has suffered a financial hardship in not receiving his promised compensation and in resorting to the judicial system to assert his rights, such hardships do not amount to the detrimental reliance that the equitable estoppel doctrine was designed to address. *See, e.g.*, *Advanced Surgery Ctr. v. Connecticut Gen. Life, Ins. Co.*, No. CIV.A. 12-2715 JLL, 2012 WL 3598815, at *12 (D.N.J. July 31, 2012) *report and recommendation adopted*, No. CIV.A. 12-2715 JLL, 2012 WL 3598799 (D.N.J. Aug. 21, 2012). As such, summary judgment to Defendants is granted on Plaintiff's promissory and equitable estoppel claims.

*v.   Count Five – Claim for Benefits Under the Severance Plan*

In Count Five of the Amended Complaint, Plaintiff asserts a claim for benefits under Baxter's Severance Plan. Specifically, Plaintiff claims that the Administrative Committee failed to conduct a full and fair review of Plaintiff's initial request and appeal for severance benefits and that the Plan's refusal to pay Plaintiff severance benefits violates the Employment Retirement Income

Security Act of 1974 ("ERISA").[20] Defendants assert that summary judgment is appropriate because the Administrative Committee's determination "fell well within the range of reasonable decisions that the Committee could make consistent with the record before it and the discretion that it possessed under the terms of the Plan to determine [Plaintiff's] claim." Defs.' Br. at 13.

On December 5, 2013, the Administrative Committee denied Plaintiff's request for severance pay, stating that severance was denied because Plaintiff had been terminated for cause. Dec. 5, 2013 Letter from Administrative Committee to Schweikert. When Plaintiff appealed, the Administrative Committee affirmed its decision, elaborating that Baxter's "[l]abor counsel affirmed for Committee what the appeal record also reflected, that . . . Schweikert was terminated for cause because an employee cannot hold full-time employment with Baxter and another employer simultaneously." June 27, 2014 Letter from Administrative Committee to Baxter.

Section 502(a)(1)(B) of ERISA permits a civil action to be brought by a participant "to recover benefits due to him under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The Supreme Court has long held that a denial of benefits under ERISA is to be reviewed "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Thus, where the plan affords the administrator discretionary authority, the administrator's interpretation of the plan "will not be dismissed if reasonable." *See Mitchell*, 113 F.3d at 437 (quoting *Firestone*, 489 U.S. at 111). In other words, when a plan

---

[20] In this Court's May 11, 2013 decision on Defendants' motion for summary judgment, the Court dismissed without prejudice Plaintiff's breach of contract claim based on terms of the Severance Agreement in order for Plaintiff to exhaust Baxter's administrative procedures. *Schweikert v. Baxter Healthcare Corp.*, No. CIV.A. 12-5876 FLW, 2013 WL 1966114, at *5 (D.N.J. May 10, 2013). Thereafter, Plaintiff exhausted his administrative remedies and amended his Complaint to include a claim for benefits under the Severance Plan. *See* Am. Compl.

administrator has discretion to determine a claimant's eligibility for benefits, the plan administrator's decision is subject to review under an arbitrary and capricious standard. *Doroshow v. Hartford Life and Acc. Ins. Co.*, 574 F.3d 230, 233 (3d Cir. 2009). "In the ERISA context, the arbitrary and capricious and abuse of discretion standards of review are essentially identical." *Funk v. Cigna Group Ins.*, 648 F.3d 182 (3d Cir. 2011).

Here, the Severance Plan states that termination "for cause, as determined at the sole discretion of Baxter," is among the nonexhaustive list of examples given in the Severance Plan to illustrate reasons for the termination for employment that render an individual ineligible for severance pay. *See* Severance Plan at 2. Further, the Severance Plan states that the Plan Administrator, or its designee, "has sole discretionary authority to interpret and construe the provisions of the [Severance] Plan, to determine eligibility for benefits under the [Severance] Plan, and to resolve any disputes that arise under the [Severance] Plan." *See id.* at 12. Therefore, the Court finds that the Plan Administrator of the Severance Plan has discretion to determine a claimant's eligibility for benefits, and, thus, the Plan Administrator's decision here is subject to review under the arbitrary and capricious, or abuse of discretion, standard. *See Doroshow*, 574 F.3d at 233.

In determining whether the denial of benefits was arbitrary and capricious, courts review "various procedural factors underlying the administrator's decision-making process, as well as structural concerns regarding how the particular ERISA plan was funded." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011). "The structural inquiry focuses on the financial incentives created by the way the plan is organized," *i.e.*, whether there is a conflict of interest, and "the procedural inquiry focuses on how the administrator treated the particular claimant." *Post v. Hartford Ins. Co.*, 501 F.3d 154, 162 (3d Cir. 2007).

However, the Third Circuit has suggested that where "an abundance of evidence [of the claimant's misconduct] . . . support[s] the denial of [the] claim," analysis of any structural conflicts of interest or procedural irregularities is unnecessary, since such factors would not "tip the scales in favor of finding that the [administrator] abused his discretion." *Estate of Schwing*, 562 F.3d at 526; *see also Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 846 (3d. Cir. 2011).

Here, I find that an abundance of evidence exists to justify the Administrative Committee's decision denying Plaintiff severance pay on the basis of his termination for accepting employment with Ikaria. First, the Severance Plan clearly states that whether an employee is terminated for cause is at the sole discretion of Baxter, and that employees terminated for cause may not be granted severance pay; thus, it follows that an employee need not breach a specific provision of the Employment Agreement or the Code of Conduct is to be terminated for cause and, thus, to be denied severance pay. Second, even if Baxter's discretion to determine whether Plaintiff was terminated for cause is not wholly unlimited, a contractual basis for the termination for cause does exist: Baxter's code of conduct, which Plaintiff signed and was part of the administrative appeal record. The Code of Conduct identifies "Time Conflicts of Interest" as conflicts that "may happen when you are engaged in a second job or business of your own that may conflict with your responsibilities with Baxter," and directs employees to "disclose any apparent or actual conflicts to management. When Baxter approves an apparent or actual conflict, the approval decision must be documented." Baxter Code of Conduct, at p. 12. I find that, pursuant to the Severance Plan, both Baxter and the Administrative Committee had ample reason to conclude that Plaintiff's dual, full-time employment with Baxter and Ikaria posed at least an apparent time conflict of interest for Baxter. Further, it is undisputed that Plaintiff did not disclose his employment with Ikaria to any Baxter management officials. Therefore, I find that it was clearly not arbitrary or capricious,

33

or an abuse of discretion for the Administrative Committee, to deny Plaintiff severance benefits on the basis of his termination for cause. *See Estate of Schwing*, 562 F.3d at 526.

Further, an examination of the structural conflict of interest and any procedural irregularities here reveals that these factors do not render the Administrative Committee's decision to be arbitrary or capricious.

Here, Defendants admit that Baxter both administers the Severance Plan through the Administrative Committee and funds its benefits out of its current operating funds, *see* Defs.' Stmt. of Facts ¶¶ 64, 65, creating an assumed conflict of interest, and, thus, a structural concern. *See Glenn*, 554 U.S. 128 (2008); *see also Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 526 (3d Cir. 2009). However, such a conflict of interest is not dispositive; courts are instructed to "consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion." *Estate of Schwing*, 562 F.3d at 525.

Further, Plaintiff complains that "Baxter never provided Plaintiff with advanced notice of its reasoning and kept changing the reason for [Plaintiff's] termination and subsequent denial of benefits," and (2) "the conclusions rendered with each decision failed to include any support whatsoever." Pl.'s Opp. Br. at 30.

This argument may be classified as contending that a procedural irregularity occurred in the administrative process. To determine whether a procedural irregularity occurred and how the irregularity impacted the proceedings, courts focus on how the administrator treated the particular claimant. *Post v. Hartford Ins. Co.*, 501 F.3d 154, 162 (3d Cir. 2007). Specifically, courts consider procedural irregularities to determine "whether, in this claimant's case, the administrator has given the court reason to doubt its fiduciary neutrality." *Id.* at 165 (internal citations omitted). These procedural irregularities may include, *inter alia*, non-compliance with Section 503 of ERISA and

its accompanying regulations, which prescribe the minimum amount of reasoning the Administrative Committee must provide in denying benefits under the Plan. *See Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 848–55 (3d. Cir. 2011).

"Although § 502 [of ERISA] provides the private right of action to bring a claim to recover benefits due, § 503 sets forth the basic requirements governing ERISA plans." *Id.* at 850–51. According to Section 503 of ERISA, every employee benefit plan must:

(1) provide adequate notice in writing to any participant or beneficiary whose claims for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133; *see also Miller*, 632 F.3d at 850. "The accompanying regulations note that 'this section sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries.'" *Id.* (citing 29 C.F.R. § 2560.503–1(a)). The regulations require a plan administrator to provide written notification of any adverse benefit determination as follows:

The notification shall set forth, in a manner calculated to be understood by the claimant . . . (i) [t]he specific reason or reasons for the adverse determination; (ii) [r]eference to the specific plan provisions on which the determination is based; (iii) [a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary[.]

29 C.F.R. § 2560.503–1(g)(1).

Here, the Administrative Committee's initial denial letter conforms to the applicable regulations. First, notification set forth the specific reason for the adverse determination: that Plaintiff had been terminated for cause. *See* Dec. 5, 2013 Letter from Administrative Committee to Schweikert, at 1. Second, the notification referred to the specific plan provision on which the

determination was based: the second page of the Plan, which states that "[y]ou are not eligible for severance pay if your employment ends for any and all reasons—other than the elimination of your position from the workforce and/or a workforce reduction—including but not limited to the following examples: you are terminated for cause, as determined at the sole discretion of Baxter." *Id.* Third, the notification described any additional material or information necessary for Plaintiff to perfect the claim: Plaintiff was instructed that he could file a request for appeal explaining why he believed his claim was incorrectly decided and could include additional information supporting his position. *Id.* The notification further informed Plaintiff that he could receive any documents that were relevant to his claim free of charge and could include any such documents in his appeal. *Id.* No explanation of why such material or information was necessary here, because the explanation was self-evident; if Plaintiff wished to successfully appeal, he had to submit reasoning and evidence supporting the contention the Administrative Committee's decision was incorrect. Finally, the notification informed Plaintiff that he could bring a civil action pursuant to ERISA Section 502 if his claim was denied on appeal. *Id.* at 2. Therefore, I find that the Administrative Committee's initial termination letter complied with ERISA Section 503 and, thus, did not constitute a procedural irregularity. *See Syed v. Hercules Inc.*, 214 F.3d 155, 163 (3d Cir. 2000); *see also Rodriguez v. Reliance Standard Life Ins. Co.*, 599 Fed. App'x 423, 425 (3d Cir. 2015).

Further, Plaintiff's argument that the Administrative Committee varied the reasons for its decision is unavailing; the record reflects that the Administrative Committee reiterated in its appeals decision that Plaintiff was denied severance because he was terminated for cause, a

termination decision that was left within the sole discretion of Baxter. *See* June 27, 2014 Letter from Administrative Committee to Baxter.[21]

In sum, I find that the structural conflict of interest resulting from Baxter's administration of the Severance Plan does not act as a tiebreaker, due to the abundance of reasoning in support of the Administrative Committee's decision. Further, Plaintiff's argument that the Administrative Committee's initial denial letter did not conform to Section 503 of ERISA and that the Administrative Committee varied its reasoning for its decision are not supported in the record. Therefore, upon review of the Administrative Committee's decision and the record upon which the Administrative Committee based its decision, the Court finds that the decision was not arbitrary or capricious, or an abuse of discretion.

Therefore, Defendants' motion for summary judgment on Plaintiff's claims is granted.[22]

  b. *Defendants' Claims*

---

[21] Further, Plaintiff also appears to also complain about (1) the amount of time taken at each stage of the administrative process, and (2) not being permitted to give live testimony to the Administrative Committee as additional procedural irregularities impacting the outcome of the decision. *See* Pl.'s Opp. Br. However, Plaintiff fails to cite any case law in support of these propositions and further fails to persuasively argue how these alleged irregularities detract from the Administrative Committee's decision. Therefore, I do not find that these complaints amount to procedural irregularities for the purposes of my Section 502 analysis.

[22] In Count Six of the Amended Complaint, Plaintiff asserts that fictional defendants John/Jane Does (1-5) "did unlawfully and maliciously induce, and persuade Baxter to break its contracts with Plaintiff, and interfered with Plaintiff's contractual rights." Am. Compl. ¶¶ 82, 83.

"The use of fictitious defendants is permitted until the plaintiff has had an opportunity to conduct discovery." *Hardy v. N.J. Dep't of Corr.*, 2009 U.S. Dist. LEXIS 69036, *2–3 (D.N.J. Aug. 7, 2009); *see White v. Fauver*, 19 F.Supp.2d 305, 312 n. 8 (D.N.J.1998). "[F]ictitious parties must eventually be dismissed, if discovery yields no identities." *Id.* (quoting *Hindes v. F.D.I.C.*, 137 F.3d 148, 155 (3d Cir. 1998)); *see also Rainbow Apparel, Inc. v. KCC Trading, Inc.*, No. 9CV05319DMCMF, 2010 WL 2179146, at *13 (D.N.J. May 26, 2010). Here, though neither party moves on this Count, the Court dismisses Count Six for failure to identify the fictitious parties.

Next, I proceed to analyze Defendants' counter-claims. As a threshold matter, Defendants argue that because Plaintiff did not file an answer to the counterclaims asserted in Defendants' answer to Plaintiff's Amended Complaint, all of the allegations in their counter-claims should be deemed admitted. Plaintiff argues that due to the procedural irregularities in this case and an administrative oversight, Plaintiff failed to respond, and seeks leave of the Court to file an answer.

I construe Plaintiff's response to be a motion for leave to late-file the answer, pursuant to Rule 6(b) of the Federal Rules of Civil Procedure. FED. R. CIV. P. 6(b); *Lujan v. National Wildlife Fed.*, 497 U.S. 871, 896 n.5 (1990); *Drippe v. Tobelinski*, 604 F.3d 778, 784 (3d Cir. 2010). "[T]he district court must make a finding of excusable neglect, under the *Pioneer* factors, before permitting an untimely motion." *Id.* (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380, 395 (1993). "Under *Pioneer*, the excusable neglect inquiry must consider "all relevant circumstances surrounding the party's omission. These include [1] the danger of prejudice, [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith." *Drippe*, 604 F.3d at 785 (citing *Pioneer*, 507 U.S. at 395). The district court's decision is reviewed under an abuse of discretion standard. *Drippe*, 604 F.3d at 785.

Upon application of the *Pioneer* factors, I find excusable neglect here. First, I find no danger of prejudice in allowing Plaintiff to file an answer, particularly because the answer is attached as an exhibit to Plaintiff's opposition brief; therefore, this factor weighs in favor of finding excusable neglect. Second, I find that though the delay in filing the answer here is long—seven months— there is no discernable impact on judicial proceedings, as discovery is already concluded and Plaintiff notes that the issues implicated by Defendant's counterclaims "are directly related to issues which have been discussed *supra* and are most aptly addressed in terms of the contractual

38

and other documents that have previously been discussed," Pl.'s Opp. Br. at 43; thus, the second factor is neutral. Third, I find that Plaintiff's reason for delay—the "procedural irregularities" of this case and "administrative oversight"—are within the reasonable control of Plaintiff, militating against finding excusable neglect here. Finally, I find that Plaintiff acted in good faith, given that Plaintiff pleads administrative oversight there are no facts or arguments by Defendants to suggest otherwise. This fourth factor, then, also weighs in favor of finding excusable neglect. On balance, and given the late stage of this litigation, I find excusable neglect on the part of Plaintiff in failing to respond to the Answer, and, thus, good cause to permit Plaintiff leave to file an answer, or a reply, to the counter-claims raised in Defendants' answer.[23] FED. R. CIV. P. 6(b). To that end, I deem the Answer submitted by Plaintiff, attached to his opposition brief as Exhibit S, to be filed, and I will consider the Answer in analyzing Defendants' counter-claims.

### i.   Count One – Breach of Contract

In Count One, Defendants assert that Plaintiff breached his Employment Agreement by failing to disclose that he had obtained other full-time employment failing to perform services for Baxter, and accepting monies paid by Baxter for time he did not perform work for Baxter.

Specifically, Defendants assert that Plaintiff breached the "Duty of Loyalty" section of the Employment Agreement, which provides as follows: part:

---

[23] I find *Routes 202 & 309 & Novelties Gifts, Inc. v. Kings Men*, No. CIV.A. 11-5822, 2014 WL 899136, at *2 (E.D. Pa. Mar. 7, 2014), the case cited by Defendants for the proposition that no leave to file an answer should be granted, to be distinguishable. In *Routes 202 & 309*, after Defendants asserted counterclaims in their answer, Plaintiff filed a motion to dismiss, which the district court denied. Plaintiff then did not attempt to file an answer until almost eight months later. *Id.* at *2.

Further, I find that an additional equitable consideration favors allowing Plaintiff to late-file his Answer: Plaintiff asserts a meritorious defense in his Proposed Answer, namely, that Defendants have suffered no damages. *See* Proposed Answer; *see also, e.g.*, *Bank v. Lake Estates Condo. Assoc., Inc.*, No. CIV.A. 11-5338, 2012 WL 1435637, at *4 (D.N.J. Apr. 25, 2012).

> Duty of Loyalty. I will exert my best efforts on the performance of my duties as an employee of Baxter and will remain loyal to Baxter during the term of my employment. I am not presently engaged in, nor shall I, during the term of my employment with Baxter, enter into any employment or agency relationship with a third party whose interests might conflict with those of Baxter.

*See* Employment Agreement.

As set forth above, to state a claim for breach of contract under New Jersey law, a claimant "must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot, Inc.*, 507 F.3d 188, 204 (3d Cir. 2007).

Here, the parties do not dispute that there was a contract between the parties (the Employment Agreement), or that Defendants performed its contractual obligations under the Employment Agreement by paying Plaintiff a salary through May 25, 2012. However, Plaintiff asserts that there was no breach because Plaintiff's employment with Ikaria did not constitute a conflict of interest, and, in his Answer, he asserts there were no damages, presumably because Plaintiff performed his day-to-day employment obligations for Baxter.

Regardless of whether Plaintiff's employment with Ikaria did constitute a conflict of interest of some sort, I find that Defendants have not established any damages that flowed from any breach of the Employment Agreement. As Plaintiff repeatedly points out, there is no evidence in the record that Plaintiff failed to perform any day-to-day tasks related to his job up until the date of his termination. While Defendants argue that Plaintiff had been required to report to work each day, the record evidence shows that Saccento, and Plaintiff's colleagues were aware at the time that he had been working from home, and the record does not demonstrate that Plaintiff had been disciplined for doing so or otherwise told to report to work. *See* Saccento Dep. 62 Further, Defendants' bare assertions that Plaintiff did not exert his best efforts on Baxter's behalf during

the course of his employment when he began working full-time for Ikaria are not borne out by any specific evidence that Plaintiff failed to accomplish his assigned tasks. *See* Pl.'s Stmt. of Facts ¶ 27. Therefore, Defendants have not shown that they have sustained any "losses as may fairly be considered to have arisen naturally from the defendant's breach of contract." *Murphy v. Implicito*, 392 N.J. Super. 245, 267 (App. Div. 2007). As such, Plaintiff's cross-motion for summary judgment is granted on Defendants' first counter-claim. *See, e.g.*, *Scopia Mortgage Corp. v. Greentree Mortgage Co., L.P.*, 233 F. Supp. 2d 625, 630 (D.N.J. 2000) *aff'd sub nom. Scopia Mortgage Corp. v. Greentree Mortgage Co., L.P.*, 56 Fed. App'x 93 (3d Cir. 2003); *Delaney v. Am. Express Co.*, No. CIV 06-5134 JAP, 2007 WL 1420766, at *5 (D.N.J. May 11, 2007).

### ii.   Count Two – Breach of the Duty of Good Faith and Fair Dealing

In Count Two, Defendants assert that Plaintiff breached the covenant of good faith and fair dealing implied in his Employment Agreement by taking affirmative steps to conceal his employment with Ikaria from Baxter. To successfully bring a claim for the breach of the implied covenant of good faith and fair dealing, a claimant must successfully prove (1) bad motive and (2) that the other part engaged in conduct that had "the effect of destroying or injuring the right of the other party to receive" the benefits of the contract. *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 225 (2005).

Here, Defendants' good faith and fair dealing claim fails for a reason similar to that which defeated its breach of contract claim: Regardless of whether Plaintiff's emails evincing an apparent attempt to conceal his employment with Ikaria from Baxter amount to bad motive, Defendants do not establish that Plaintiff's conduct had the effect of destroying or injuring Defendants' rights to receive the benefits of the Employment Agreement, *i.e.*, Plaintiff's employment services. *See id.* As stated *supra*, Defendants have failed to show that Plaintiff shirked any of his day-to-day

responsibilities for Baxter during the time he was simultaneously employed with Ikaria. *See, e.g.*, *Zodda v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. CIV. 13-7738 FSH, 2015 WL 926221, at *11 (D.N.J. Mar. 4, 2015) (granting defendants' motion to dismiss a good faith and fair dealing claim because the plaintiff's "opposition fails to identify how either Defendant destroyed or injured the right of Daniels to receive the fruits of his contract"); *Gen. Elec. Capital Corp. v. Oncology Associates of Ocean Cnty., LLC*, No. CIV. 10-1972, 2014 WL 4793484, at *3 (D.N.J. Sept. 25, 2014). Therefore, Plaintiff's cross-motion for summary judgment is granted on Defendants' second counter-claim.

### iii.   Count Three – Breach of the Duty of Good Faith, Loyalty, and Trust

Third, Defendants assert that Plaintiff breached the duty of good faith, loyalty, and trust by failing to disclose that he was working for another employer.

The duty of employee loyalty "'consists of certain very basic and common sense obligations,' including, most significantly, a prohibition against 'acting contrary to the employer's interest.'" *Gregory D'Alessandro Enterprises, Inc. v. Universal Mktg. Grp., LLC*, No. A-0951-06T1, 2008 WL 794468, at *4 (N.J. Super. Ct. App. Div. Mar. 27, 2008) (quoting *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 302 (2001)). "The scope of the duty of loyalty that an employee owes to an employer may vary with the nature of their relationship. Employees occupying a position of trust and confidence, for example, owe a higher duty than those performing low-level tasks. Assisting an employer's competitor can constitute a breach of the employee's duty of loyalty. Similarly, an employee's self-dealing may breach that duty." *Cameco, Inc. v. Gedicke*, 157 N.J. 504, 516 (1999). "[T]o state a claim for breach of the duty of loyalty under New Jersey law, a plaintiff must allege (1) the existence of an employer-employee relationship, (2) breach of the duty of loyalty, and (3)

resulting harm to the plaintiff." *Canon Fin. Servs., Inc. v. Bray*, No. CIV. 14-3829 RBK/KMW, 2015 WL 851816, at *4 (D.N.J. Feb. 26, 2015) (citing *Cameco*, 157 N.J. at 516–18).

Here, Defendants' employee disloyalty claim fails because Defendants fail to demonstrate a resulting harm from the asserted breach. *Canon*, 2015 WL 851816, at *4 (citing *Cameco*, 157 N.J. at 516–18*; F.G. v. MacDonell*, 150 N.J. 550, 564 (1997)). Again, Defendants marshal no evidence in support of the contention that they were injured by Plaintiff's decision to commence simultaneous full-time employment with Ikaria. As such, summary judgement in favor of Plaintiff is granted on Defendants' third counter-claim.

### iv.   Count Four – The "Faithless Servant" Doctrine

Fourth, Defendants assert that Plaintiff "acted as a faithless servant to Baxter by falsifying his work efforts and availability, concealing his full-time employment with Ikaria . . . an accepting a salary from Baxter for a job he did not perform." Defs.' Br. at 26.

Defendants cite no New Jersey law directly analyzing this doctrine in support of its motion for summary judgment on this counter-claim; rather, Defendants cite to *Cameco* for its language regarding recoupment of wages from a disloyal employee, under the breach of duty doctrine, and New York case law. Indeed, the Court's independent review of New Jersey law reveals no cases applying the faithless servant doctrine. As such, the Court concludes that the faithless servant doctrine has no basis in New Jersey law and grants summary judgment for Plaintiff on Defendants' fourth counter-claim.

### v.   Count Five – Conversion

Finally, in Count Five, Defendants assert that Plaintiff willfully converted the salary that Baxter paid to him for services he did not perform.

> Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.

*Chicago Title Ins. Co. v. Ellis*, 409 N.J. Super. 444, 454 (App. Div. 2009) (quoting Restatement (Second) of Torts § 222A(1)). "Conversion is an intentional tort in that the defendant must have intended to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights. However, the defendant need not knowingly or intentionally act wrongfully for a conversion to occur." *Chicago Title Ins. Co.*, 409 N.J. Super. at 454 (internal citation and quotation marks omitted). "Where a sum of money is identifiable, courts look to the relative rights of each party to possession and use of the money to determine whether a cause of action lies for conversion." *Id.* at 456. "The crux of conversion is wrongful exercise of dominion or control over property of another without authorization and to the exclusion of the owner's rights in that property." *Id.* Defendants argue that Plaintiff "is not entitled to the wages paid for those expected services and he should repay them to Baxter." Defs.' Br. at 27.

Here, as in their other counter-claims, Defendants do not establish that Plaintiff wrongfully obtained a salary from Baxter during his simultaneous employment with Ikaria. Rather, the evidence shows that Plaintiff performed his assigned tasks up through his termination date. Therefore, Plaintiff's conversion claim fails; as such, summary judgment is granted to Plaintiff on Defendants' fifth counter-claim.

In sum, summary judgment is granted in favor of Plaintiff on all of Defendants' counter-claims.

### IV.   Conclusion

For the foregoing reasons, Defendants' motion for summary judgment on Plaintiff's Amended Complaint is granted, and their motion for summary judgment on Defendants' counter claims is

denied. Plaintiff's cross-motion for summary judgment on his Amended Complaint is denied, and his cross-motion for summary judgment on Defendants' counter-claims is granted. An appropriate order shall follow.


Dated: July 29, 2015                              /s/     Freda L. Wolfson
                                                  Freda L. Wolfson, U.S.D.J.